1  Edmundo Robaina (AZ State Bar No. 018125)
   Robaina & Kresin PLLC
2  5343 North 16th Street, Suite 200
   Phoenix, Arizona 85016
3  Telephone: (602) 682-6450
   Facsimile: (602) 682-6455
4  epr@robainalaw.com

5  Cory S. Fein (TX State Bar No. 06879450)
   (pro hac vice pending)
6  CORY FEIN LAW FIRM
   712 Main Street, Suite 800
7  Houston, Texas 77002
   Telephone: (281) 254-7717
8  Facsimile: (530) 748-0601 (fax)
   cory@coryfeinlaw.com
9

10  Attorneys for Relators

11          IN THE UNITED STATES DISTRICT COURT

12            FOR THE DISTRICT OF ARIZONA

13  United States of America,              No.    CV-20-00176-PHX-GMS
              Plaintiff,
14
    ex rel. Jay Radhakrishnan, M.D., and
15  William Julien, M.D.

16          Relators

17  v.                                     FILED *IN CAMERA* AND UNDER
                                           SEAL PURSUANT TO 31 U.S.C.
18  (1)  Yury Gampel;                              §3730(b)(2)
    (2)  Scott M. Brannan;
19  (3)  Nobility Management, LLC;
    (4)  Modern Vascular, LLC;                     COMPLAINT
20  (5)  Modern Vascular Management, LLC;    (Jury Trial Demanded)
    (6)  Modern Vascular Institute, LLC;
21  (7)  Modern Vascular of Mesa, LLC;
    (8)  Modern Vascular of Glendale, LLC;
22  (9)  Modern Vascular of Sun City, LLC;
    (10) Modern Vascular of Tucson, LLC;
23  (11) Modern Vascular of San Antonio LLC;
    (12) Modern Vascular of Fort Worth LLC;
24  (13) Modern Vascular of Denver, LLC;
    (14) Modern Vascular - Navajo, LLC; and
25  (15) Investor Does 1 – 100.

26          Defendants.

27

28
                              1

FILED ✓   LODGED ___
RECEIVED ___   COPY ___

JAN 2 2 2020

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

SEALED

Relators Jay Radhakrishnan, M.D., and William Julien, M.D., through their attorneys and on behalf of the United States of America, file their Original Complaint against Defendants: (1) Yury Gampel; (2) Scott M. Brannan; (3) Nobility Management, LLC; (4) Modern Vascular, LLC; (5) Modern Vascular Management, LLC; (6) Modern Vascular Institute, LLC; (7) Modern Vascular Of Mesa, LLC; (8) Modern Vascular Of Glendale, LLC; (9) Modern Vascular Of Sun City, LLC; (10) Modern Vascular Of Tucson, LLC; (11) Modern Vascular of San Antonio LLC; (12) Modern Vascular of Fort Worth LLC; (13) Modern Vascular of Denver, LLC; (14) Modern Vascular - Navajo, LLC; and (15) Investor Does 1 – 100, and allege as follows:

## I.   INTRODUCTION

1.      This action is brought on behalf of Relators and the United States pursuant to the False Claims Act, 31 U.S.C. sections 3729, *et seq*., the Stark Law, 42 U.S.C. § 1395nn, et seq., and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A).

2.      Defendants Yury Gampel ("Gampel"), with the assistance of Scott M. Brannan ("Brannan"), individually and through their "Modern Vascular" companies, (referred to herein as "Modern Vascular Companies" or "MV Companies"), have established several companies throughout Arizona, New Mexico, Texas and other states as part of their network of investor-owned office-based labs ("OBLs") that treat peripheral arterial disease. Each MV Company is owned in part by Gampel, and up to 40% by the investor/physicians who refer patients to the OBL, in violation of the Anti-Kickback Statute and Stark Law. Scott Brannan is believed to have some ownership role in the MV Companies as well.

3.      These "MV Companies" are named as Defendants.

4.      Some of these companies have not yet opened OBLs and are in the process of soliciting physician/investors and establishing OBLs in those regions. The other companies are operating active OBLs.

2

## II.   JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

6.     This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendants because the Defendants can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

7.     In addition, this Court has jurisdiction under the doctrine of supplemental jurisdiction over the state law claims pleaded or which may be pleaded to the extent that these claims arise out of a common nucleus of operative facts under 28 U.S.C. §1367(a).

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a) because at least one Defendant resides in or transact business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district. Relators are familiar with Defendants' Stark Law violations and the Anti-Kickback Statute violations alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

9.     This case is not based on a public disclosure within the meaning of the FCA, and Relators are the original source of the allegations contained herein. Relators have knowledge of the alleged fraud and disclosed this information to the government before filing suit, pursuant to 31 U.S.C. § 3730(e)(4)(B). Relators believe that there has been no public disclosure of these allegations and transactions such that subparagraph (e)(4) does not apply and this disclosure was not necessary. However, as a precautionary measure, in the event there has been a public disclosure, Relators made a pre-complaint disclosure in order to qualify as "original sources" under subparagraph (e)(4)(B)(2).  Relators have knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing their False Claims Act complaint.

## III.   PARTIES

### A.   Yury Gampel and Scott M. Brannan

10.   Defendant, Yury Gampel, is a citizen and resident of California. He can be served at 26500 W Agoura Rd St 201, Calabasas, CA, 91302.

11.   Defendant, Scott M. Brannan, is a citizen and resident of Arizona. He can be served at 535 E. McKellips Road, Units 111-112, Mesa, AZ, 85203.

### B.   MV Company Defendants

12.   Defendant, Modern Vascular, LLC is an Arizona corporation. Its Statutory Agent is Arizona Business Management, 4650 E Cotton Center Blvd Ste 250, Phoenix, AZ 85040. Its Address is 4650 E Cotton Center Blvd Ste 155, Phoenix, AZ 85040. Its Manager is Nobility Management, LLC, 26500 W Agoura Rd Ste 201, Calabasas, CA, 91302.

13.   Defendant, Modern Vascular Institute, LLC is an Arizona corporation. Its Statutory Agent is Arizona Business Management, 4650 E Cotton Center Blvd Ste 250, Phoenix, AZ 85040. Its Address is 535 E. McKellips Road, Units 111-112, Mesa, AZ, 85203. Its Manager is Nobility Management, LLC, 26500 W Agoura Rd Ste 201, Calabasas, CA, 91302

14.   Defendant, Modern Vascular Of Mesa, LLC is an Arizona corporation. Its Statutory Agent is Arizona Business Management, 4650 E Cotton Center Blvd Ste 250, Phoenix, AZ 85040. Its Address is 535 E. McKellips Road, Bldg 3, Mesa, AZ, 85203. Its Manager is Nobility Management, LLC, 26500 W Agoura Rd Ste 201, Calabasas, CA, 91302

15.   Defendant, Modern Vascular Of Glendale, LLC is an Arizona corporation. Its Statutory Agent is Arizona Business Management, 4650 E Cotton Center Blvd Ste 250, Phoenix, AZ 85040. Its address is: 11851 N 51st Ave Bldg. G, Glendale, AZ, 85304. Its manager is Yury Gampel.

16.   Defendant, Modern Vascular Of Sun City, LLC is an Arizona corporation. Its Statutory Agent is Arizona Business Management, 4650 E Cotton Center Blvd Ste 250,

Phoenix, AZ 85040. Its address is 14780 W. Mountain View Blvd., Suite 120, Surprise, AZ, 85374. Its manager is Nobility Management, LLC, 26500 W Agoura Rd Ste 201, Calabasas, CA, 91302

17. Defendant, Modern Vascular Of Tucson, LLCis an Arizona corporation. Its Statutory Agent is Arizona Business Management, 4650 E Cotton Center Blvd Ste 250, Phoenix, AZ 85040. Its address is 2171 W. Orange Grove, Tucson, AZ, 85741. Its manager is Nobility Management, LLC, 26500 W Agoura Rd Ste 201, Calabasas, CA, 91302.

18. Defendant, Nobility Management, LLC is a California limited liability corporation, doing business in Arizona at 1846 E Innovation Park Dr., Ste 100, Oro Valley, AZ, 85755. Its registered agent for service is: Registered Agents Inc., 1846 E. Innovation Park Dr., Ste 100, Oro Valley, AZ, 85755. Its manager is Yury Gampel, 26500 W Agoura Rd St 201, Calabasas, CA, 91302. Its member is Gampel Holdings LP at the same address.

19. Defendant, Modern Vascular of San Antonio LLC is a Texas corporation. Its Registered Agent is Business Filings Incorporated, 701 Brazos St., Ste 720, Austin TX 78701-2556. Its address is 701 Brazos St., Ste 720, Austin TX 78701-2556. It was formed April 2, 2019. Its manager is Yury Gampel, 4650 E Cotton Center Blvd, Ste. 155, Phoenix, AZ 85040.

20. Defendant, Modern Vascular of Fort Worth LLC is a Texas corporation. Its registered Agent is CT Corporation System, 1999 Bryan St., Ste. 900, Dallas TX 75201-3140. Its address is: 1999 Bryan St., Ste. 900, Dallas TX 75201-3140. It was formed October 10, 2019. Its manager is Modern Vascular Management, LLC, 4650 E Cotton Center Blvd, Ste. 155, Phoenix, AZ 85040.

21. Defendant, Modern Vascular Management, LLC, is a Delaware Corporation doing business in Arizona at 4650 E Cotton Center Blvd, Ste. 155, Phoenix, AZ 85040. Its registered agent is Registered Agents Inc., 5900 Balcones Drive, Suite 100, Austin, TX 78731. It registered December 18, 2019 with effective date January 1, 2020. Its manager

is Yury Gampel, 495 Brickel Ave., Unit 5404, Miami FL 33131.

22. Defendant, Modern Vascular of Denver, LLC is a Colorado corporation formed June 19, 2019. Its registered agent for service is C T Corporation System, 7700 E Arapahoe Rd Ste 220, Centennial, CO 80112-1268. Its principal address is 4650 E. Cotton Center Blvd., Suite 155, Phoenix, AZ 85040.

23. Defendant, Modern Vascular - Navajo, LLC is a New Mexico corporation. Its registered agent for service is High Desert Corporate Filings LLC, 530-B Harkle Rd., Ste. 100, Santa Fe NM 87505. It's principal address is 4650 E. Cotton Center Blvd., Suite 155, Phoenix, AZ 85040.

**C.    The Referring Investors**

24. Defendants, Investor Does 1 – 100 are "Referring Investors," i.e., physicians who have an ownership interest in one the MV Companies established by Gampel and Brannan, refer patients to an office-based lab ("OBL") owned by that MV Company for invasive procedures, and receive dividends from that MV Company.

**D.    Relators and the United States**

25. Relator, Jay Radhakrishnan, M.D., ("Radhakrishnan"), is a citizen and resident of Texas. He resides in The Woodlands, Montgomery County, Texas. At all material times, Radhakrishnan has been a Texas-licensed physician. Radhakrishnan is a board-certified interventional radiologist who practices in The Woodlands. Radhakrishnan also reads and analyzes ultrasound scans as a contractor for TeleRad Connect. Some of the scans he reads and analyzes come from High Desert Doppler, which performs ultrasound scans at OBLs that are part of the Modern Vascular network, including the New Mexico locations.

26. Relator, William Julien, M.D., ("Juien"), is a citizen and resident of Florida. He resides and practices medicine in Coconut Creek, Florida. At all material times, Julien has been a Florida-licensed physician. Julien is a board-certified interventional radiologist who practices in Coconut Creek, Florida.

27. The United States is herein named as a Plaintiff pursuant to the False Claims

6

1  Act ("FCA"), 31 U.S.C. §3729, *et seq.*, as funds of the United States have been directly or

2  indirectly paid to Defendants, as a result of the knowingly false claims, records and

3  statements alleged in this Complaint that Defendants made or caused to be made.

4  **IV.    FACTS**

5      **A.    Gampel and Brannan's Kickback Scheme**

6      28.    In or around 2016 Gampel, with the assistance of Brannan, came up with the

7  concept of "Modern Vascular" a series of outpatient centers that specialize in the

8  treatment of peripheral arterial disease at multiple locations throughout Arizona.

9      29.    As part of this scheme Gampel formed Modern Vascular, LLC; Modern

10  Vascular Management, LLC; Modern Vascular Institute, LLC; and Nobility Management,

11  LLC.

12      30.    Gampel began forming multiple MV Companies to open "Office-Based

13  Labs" (outpatient centers that specialize in the treatment of peripheral arterial disease) at

14  multiple locations throughout Arizona. (These office-based labs are referred to as "OBLs"

15  in the industry.)

16      31.    Gampel formed the MV Companies named as Defendants, with the name of

17  an Arizona city or regions in their names, each to own one or two OBLs (for example,

18  Modern Vascular of Mesa, LLC; Modern Vascular of Tucson, LLC; Modern Vascular of

19  Glendale, LLC; Modern Vascular of Sun City, LLC; etc.)

20      32.    Gampel expanded beyond Arizona, forming additional companies, each to

21  own one or two OBLs (for example, Modern Vascular of San Antonio, LLC; Modern

22  Vascular of Fort Worth, LLC; Modern Vascular of Denver, LLC; Modern Vascular -

23  Navajo, LLC; etc.)

24      33.    For each of the cities or regions, Gampel, with the assistance of Brannan,

25  solicited potential referral sources (usually family medicine doctors, internal medicine

26  doctors, and podiatrists) in that region as potential investors for each OBL. These

27  "Referring Investors" are potential additional defendants.

28      34.    Gampel's pitch to the Referring Investors was that they could ensure the

profitability of the MV Company in which they invested by referring patients to the OBL owned by that MV Company for invasive procedures.

35.    The standard business model used by Gampel is to sell a maximum 40% ownership interest of each MV Company to a group of investor physicians who refer patients to that MV Company's OBL.

36.    For example, if Gampel sold 40% of a MV Company at $7,500 per 1% share, Gampel would raise $300,000, which he would use to set up the OBL location, purchase the necessary equipment, hire staff, etc.

37.    Gampel would send a Subscription Agreement and/or Operating Agreement to each physician whom Gampel believes has the ability to refer PAD patients to an OBL and might be interested in investing in a MV Company.

38.    The Subscription Agreement and/or Operating Agreement sets forth the price paid by the investor, the number of shares in the MV Company that the investor is to receive, and the terms upon which the investor will be paid dividends by the MV Company. Generally, each investor is permitted to buy 2% of the MV Company, for $15,000. Pursuant to the Subscription Agreement and/or Operating Agreement, the investor's dividends increase as the profitability of the OBL owned by the MV Company increases.

39.    The kickbacks take the form of the dividends paid by the MV Companies to the Referring Investors who refer patients to the OBL owned by the MV Company in which they invested.

40.    The OBLs established as part of Gampel's scheme typically have only one physician on site (who performs the invasive procedures at the OBL), a contract physician who interprets ultrasound scans (off site), and some support staff on site (including a receptionist, medical assistants, and a nurse practitioner.)

41.    Each MV Company established by Gampel gets almost all of its patients from referrals by the Referring Investors who own shares in that MV Company, in violation of the Stark Law and the Anti-Kickback Statute. The OBLs have a very narrow

8

focus—they perform ultrasound tests of patients' lower extremity arterial system (known as Doppler or vascular ultrasound), and treat Peripheral Arterial Disease ("PAD") by means of performing arteriogram, angioplasty, stenting, and atherectomy procedures.

42.     Pursuant to the Anti-Kickback Statute and Stark Law, every bill submitted to Medicare (or other Government program) by an MV Company in Gampel's network for treatment of a patient referred to that MV Company by an Investor Defendant is fraudulent.

43.     In order to make the kickback scheme generate the promised profits, Gampel put heavy pressure on the Proceduralist doctors at the Modern Vascular OBLs to perform invasive procedures on as many referred patients as possible. Gampel ensured that the OBLs treated patients according to the procedures that received the highest Medicare reimbursement, without regard to the medical treatment that patients actually needed.

44.     The process could be seen as five stages. In Stage 1, the patient is referred to a vascular specialist for evaluation. In Stage 2, the patient undergoes a thorough history and physical exam to determine if the patient has symptoms related to PAD. In Stage 3, the patient undergoes an ultrasound Doppler (or less frequently a CT Angiogram, which is a CAT scan of the arteries), to see if there are any areas of narrowing/blockage. In Stage 4, if the patient has symptoms of PAD, and a positive noninvasive test (Doppler or CT Angiogram), then the patient will be scheduled for an angiogram (injecting the dye). In Stage 5, (which should be reached only if the angiogram shows significant blockage,) the patient receives an angioplasty, stent, and/or atherectomy.

45.     The fifth stage is the most lucrative and has the highest Medicare reimbursement rates. Accordingly, the kickback scheme and promised dividend payments to the Referring Investors, depend on the OBLs maximizing the number of patients who proceed all the way to Stage 5 (even when that is medically unnecessary), and Gampel applied extensive pressure to doctors who stopped before reaching Stage 5.

**B.  Solicitation of San Antonio Investors on March 2, 2019**

46.  Gampel solicited physicians and podiatrists for each of the MV Companies that he established.

47.  The process began with Gampel choosing a location where he wanted to open an OBL, then identifying physicians and podiatrists in the area that were in a position to refer patients. Next Gampel would solicit those physicians and podiatrists by explaining the general outline of the scheme. He would then send Subscription Agreements and/or Operating Agreements to the physicians and podiatrists governing the terms of the kickback scheme.

48.  On March 2, 2019, Gampel had a conference call in advance of establishing the San Antonio location (the "San Antonio Call"). During the San Antonio Call, Gampel gave his pitch to the "San Antonio Solicitees," which include two orthopedic surgeons and the podiatrist members of the two largest podiatry groups in San Antonio: San Antonio Podiatry Associates, P.C. (sapodiatry.com), and The Podiatry Group of South Texas (thepodiatrygroup.com).

49.  One of the San Antonio Solicitees, Richard Pollock DPM, is a podiatrist in San Antonio who was the leader of the group of podiatrists who agreed to invest in Modern Vascular of San Antonio LLC. He actively participated in the San Antonio Call, vouching for Gampel, and gushing enthusiastically about what a great "no-brainer" investment the kickback scheme was.

50.  Participating in the call with Gampel and Pollock were two orthopedic surgeons: Guy Reyes MD, and Craig Glauser MD. Also participating in the call were the members of the two largest podiatry groups in San Antonio: San Antonio Podiatry Associates, P.C. (sapodiatry.com), and The Podiatry Group of South Texas (thepodiatrygroup.com). These podiatrists include: Richard Keh DPM, Russel Stanley DPM, Richard Bellacosa DPM, Richard Perez DPM, Martin Chaney DPM, Robert Castillo DPM, Jordan Mechell DPM, Charles Melton DPM, Darren Silvester DPM, Jose Hilario DPM, Morris Stribling DPM, Ed Davis DPM, Steven Kissel DPM, Robert Grazer

DPM, Rolando Santellana DPM, and Daniel Cruz DPM.

51.     During the San Antonio Call, Gampel explained the terms of the kickback scheme, promised that it was legal, and promised that a $15,000 investment would return over $1 million in less than 5 years. He told the potential investors that his scheme was not meant to be passive revenue and was a "participant investment."

52.     He explained that typical number of monthly patient referrals included 8, 12 or 22 per month. He stated that the OBLs opened as part of his scheme typically received more than $10 million in revenue per year, with between 3 and 4.5 million dollars in EBITDA in the first year of operations.

53.     He required a $15,000 investment for a 2% investment interest in the company and promised that after the fourth month of an OBL opening, the investor would receive monthly dividend checks of $7,000 to $8,000 per month, and within a year, the investors would receive as much as $80,000 - $100,000 per year, an absurdly high return on their $15,000 investment.

54.     Additionally, Gampel stated that within 3 to 5 years, he would sell the practice for a 10 times multiple of revenue, meaning each investor would cash out his $15,000 investment for between $800,000 to $1,000,000.

55.     Taking the worst-case scenario of $80,000 per year for 5 years, plus an $800,000 buy-out, investors were promised about $1.2 million in return for their $15,000 investment, or 80 times their investment in only 5 years, with their entire original investment returned within 6 or 7 months.

56.     This return seems too good to be true for a legitimate investment because it is not a legitimate investment; it is an illegal kickback scheme.

57.     Gampel repeatedly explained to the San Antonio potential investors that this was not a passive investment, and that the money they were investing was not important, but that the only important thing was that the investors refer patients and influence other doctors to refer patients to the OBL so the investors could enjoy these ludicrous profits. He told the San Antonio Solicitees that if they were seeing between 100 and 140 patients

1   per week, they needed to refer 3-5 vascular consults per week to the company in which

2   they invested to make the scheme profitable.

3       58.    Gampel specifically mentioned that if an investor moved to another town, or

4   otherwise became in a position where he could no longer refer patients to the OBL, the

5   investor would have to sell his shares back to the company. This highlighted the fact that

6   this was not a legitimate investment, but was a kickback scheme. He stressed several time

7   that the money invested was not important; and that they important thing was that the

8   investors were business-minded and understood that their profits depended on the volume

9   of referrals they made to the OBL company paying their monthly dividends.

10   ## C.    Locations and Physicians

11       59.    Most of the San Antonio Solicitees were convinced to invest and the result

12   was the creation of Modern Vascular of San Antonio LLC, which owns and operates an

13   OBL located at 9819 Huebner Rd., Bldg. 4, San Antonio, TX 78240. Dr. Dallas Broadway

14   (NPI 1366646416) is the vascular interventional radiologist operating at this location.

15       60.    Brannan and Gampel's scheme, described above, led to the creation of the

16   following limited liability companies, operating the OBL's listed below:

17       a)    The San Antonio company and OBL listed above;

18       b)    Modern Vascular of Glendale, LLC, which owns and operates

19   two OBLs. The first one is located at 14780 W. Mountain View Blvd. #120

20   Surprise, AZ 85374. The Vascular Interventional Radiologist at this Surprise

21   location is Dr. Luis Nadal.

22       c)    Modern Vascular of Glendale, LLC's second OBL is located

23   at 11851 N 51st Ave. G110 Glendale, AZ 85304. The Vascular Interventional

24   Radiologist at this Glendale location is Dr. Nikhil Patel.

25       d)    Modern Vascular of Mesa, LLC, which owns and operates an

26   OBL at 535 E. McKellips Rd. #111 Mesa, AZ 85203. The Vascular Interventional

27   Radiologist at this location is Dr. Arthur Maydell.

28       e)    Modern Vascular Institute, LLC, which owns and operates an

OBL in East Mesa at 2919 S. Ellsworth Rd. #115, Mesa, AZ 85212. The Vascular Interventional Radiologist at this location is Dr. Brian Zernich.

        f)     Modern Vascular of Tucson, LLC, which owns and operates an OBL at 2171 W. Orange Grove Tucson, AZ 85741. The Vascular Interventional Radiologist at this location is Dr. Jack Hannallah.

        g)     Modern Vascular - Navajo, LLC, which owns and operates an OBL at 7800 Constitution Ave. NE Albuquerque, NM 87110. The Vascular Interventional Radiologist at this location is Dr. Kent Hootman.

        h)     Modern Vascular - Navajo, LLC, also owns and is operating, or will soon be operating, a second OBL at 1580 State Route 264 Suite B. Tse Bonito, NM 86515. The Vascular Interventional Radiologist at this location will also be Dr. Kent Hootman.

        i)     Modern Vascular of Denver, LLC, which owns and operates (or will soon be operating) an OBL at 9441 Huron St. Thornton, CO 80260. The Vascular Interventional Radiologist at this location is not known.

        j)     Modern Vascular of Fairfax, LLC, which owns and operates (or will soon be operating) an OBL at 2812 Old Lee Highway #100 B-D Fairfax, VA 22031. The Vascular Interventional Radiologist at this location is Dr. Albert Chun.

        61.     Brannan and Gampel have announced that they will be opening new locations in Fort Worth, Texas; Tulsa, Oklahoma; Southaven, Mississippi (a suburb of Memphis Tennessee); and Plantation Florida.

**D.**    **Peripheral Arterial Disease**

        62.     PAD is a circulatory disease caused by plaque building up in an artery, which decreases blood flow.

        63.     Because PAD is a condition that mostly impacts persons over age 65, a large percentage of the MV Companies' patients are Medicare patients. PAD is a common condition that affects nearly 20% of Americans over age 65. During the San Antonio Call,

one of the investors mentioned that an estimated $500 million worth of vascular procedures would be performed during 2019, so there was plenty of money to be made.

64.     PAD can be treated via conservative non-invasive methods (including increasing a patient's exercise, improving the patient's diet, cessation of tobacco use, and by medication.) Alternatively, it can be treated by invasive procedures including arteriogram/angiograms, balloon angioplasty, stent placement, and atherectomy.

**E.     Treatment of PAD by Invasive Procedures**

65.     The first step in treating PAD by use of invasive procedures is performing an ultrasound scan of the patient's lower extremities. The second step is the arteriogram or angiogram, which is the injection of dye into a blood vessel to help pinpoint the blockage or narrowing in the artery. After identifying the narrowing/blockage in the artery, an angioplasty balloon is placed across the narrowing, and then inflated to reopen the artery and ultimately increase blood flow.

66.     In addition to the balloon angioplasty, a metallic stent can be placed into an artery to keep it open. The last technique used to improve flow in a lower extremity artery is with the use of an atherectomy device. An atherectomy involves using a device placed inside the artery to shave plaque out of the artery, and ultimately increase flow through the artery.

67.     The MV Company's OBLs contract out for ultrasound scans. For example, in New Mexico, the OBL contracts with High Desert Doppler, which sends its staff to perform the ultrasound scans on patients. High Desert Doppler contracts with TeleRad Connect, which has contract physicians read and interpret the scans. Relator Jay Radhakrishnan is one of the physicians that reads and analyzes scans from Modern Vascular's New Mexico location.

68.     Medicare Part B covers the technical component of an ultrasound procedure (the taking of the image) when it happens in an OBL instead of a hospital. Medicare Part B also covers the professional component of the ultrasound (the doctor interpreting the image).

69.     Medicare Part B also covers the invasive procedures performed at the OBLs.

70.     The MV Companies and/or their physicians do not bill for the services associated with the ultrasound scans and interpretation, but bill for the invasive procedures.

71.     Many of Defendants' patients were covered by the Indian Health Service ("IHS"), within the Department of Health and Human Services. IHS provides health care for approximately 2.2 million eligible American Indians/Alaska Natives through a system of programs and facilities located on or near Indian reservations, and through contractors in certain urban areas. Accordingly, Defendants submitted fraudulent claims to IHS in the same manner as

72.     These billings to Medicare Part B, or other Government payors, by the MV Companies and their physicians were in violation of the Stark Law and the Anti Kickback Statute because of the relationship between the Referring Investors, Gampel, and the MV Companies described herein.

73.     Invasive PAD procedures performed in an OBL (arteriogram, angioplasty, stent placement, and atherectomy) have a high reimbursement rate from Medicare and are very profitable in an OBL setting. The reimbursement by Medicare for these procedures is in the range of $17,000-$30,000 per procedure.

74.     Some of the more common CPT codes that are used in the treatment of PAD in an OBL, and their approximate dollar reimbursement values by Medicare (which vary by region), are as follows:

| Code | Procedure | Amount |
|------|-----------|--------|
| 37221 | Iliac artery stent placement | $4,892 |
| 37224 | Superficial femoral artery angioplasty | $3,999 |
| 37225 | Superficial femoral artery balloon angioplasty plus atherectomy | $11,763 |
| 37226 | Superficial femoral artery stent placement | $9,637 |

15

| 37227 | Superficial femoral artery atherectomy plus stent placement | $15,941 |
| 37228 | Tibial artery angioplasty | $5,734 |
| 37229 | Tibial artery atherectomy | $11,588 |
| 37231 | Tibial artery atherectomy plus stent | $14,345 |

75.     In many of these procedures, a physician can bill under multiple codes in a single case. In these situations, the highest paying code is paid in full and the other codes are paid at half. For example, a common combination of procedures performed by an OBL physician would be a superficial femoral artery atherectomy plus stent placement (Code 37227) combined with a tibial artery atherectomy plus stent (Code 37231). In this example, the reimbursement would be $15,941 for Code 37227 and half of $14,345 for Code 37231, for a total of $23,113.50.

**F.     Proper Treatment of Patients with Suspected PAD**

76.     Typically, when primary care physicians or podiatrists see patients with suspected PAD, they refer the patient to a vascular specialist (either an interventional radiologist, interventional cardiologist, or vascular surgeon) who does a thorough evaluation in their office to determine whether an invasive procedure is warranted, or whether the patient should be treated with conservative management (e.g., exercise, diet, smoking cessation, or medication).

77.     Invasive procedures (e.g., angiogram, angioplasty and/or atherectomy) are reserved for patients with severe PAD with Chronic Limb Ischemia (CLI), and/or patients whose symptoms do not improve with non-invasive conservative management techniques.

**G.     Gampel's Scheme for Treating Patients with Suspected PAD**

78.     Once a primary care physician or podiatrist invests in one of the MV Companies, that physician begins to refer his or her patients directly to that MV Company's OBL with a diagnosis of PAD, and orders an ultrasound for further workup.

79.     The investors know that if they refer a patient to a vascular specialist/vascular center that is not part of Gampel's network of companies, that patient

16

may be advised to try conservative measures, such as smoking cessation, dietary modifications, exercise, weight loss, and medication for a period of time, and ultimately not require an invasive procedure. Their profit motive causes them to refer their patients directly to the OBL owned by a MV Company in which they have an ownership interest, ensuring that every patient, even those with mild and/or asymptomatic PAD that could be treated conservatively, has an invasive procedure performed.

80.     Gampel and the referring physicians (all of whom directly profit from the invasive procedures performed at the OBLs) ensure that invasive procedures are ordered for most, if not all, patients.

81.     Each patient who arrives at an OBL owned by a MV Company has already been diagnosed as having PAD by one of the Referring Investors (i.e. family medicine physician, internal medicine physician, podiatrist) and is being sent by the Investor Defendant to the OBL (which the Investor Defendant partially owns) specifically to have an invasive procedure performed.

82.     Gampel ensured that the vast majority of patients referred to an OBL in his network were treated with the highest reimbursing atherectomy procedures. He accomplished this by pressuring doctors at these OBLs to maximize their "conversion rate," i.e., the percentage of referred patients who received these most expensive invasive procedures. Gampel harshly criticized and pressured doctors, sometimes on a daily basis, for determining too many patients did not need an atherectomy. By comparison, legitimate interventional radiologists, working at OBLs that are not part of a kickback scheme, frequently determine that a dye test administered to a patient reveals minimal or no blockage such that an atherectomy is not necessary, and that patient never progresses beyond an angiogram. These legitimate practices will have a mix of high-reimbursement and low-reimbursement procedures. At Modern Vascular OBLs doctors are much more likely to perform atherectomies on patients, such that they maximize the amount of revenue per patient.

**H.      Harm to the Government**

83.     Gampel and Brannan's business model described herein interferes with and skews clinical decision-making by incentivizing the Referring Investors to refer patients to the OBLs in which they have an ownership interest for invasive procedures. As stated above, PAD can be treated initially by conservative methods, including increased exercise, improved diet, cessation of tobacco use, and by medication. However, an Investor Defendant with an ownership interest in a MV Company is incentivized not to suggest any of these conservative methods, but rather to refer a patient to have an invasive procedure at the OBL owned by the MV Company in which the Investor Defendant has an ownership interest. Gampel stated that the physicians in an MV Company OBL lab treat about 15-18 cases of arterial disease per week.

84.     This increases costs to Medicare by causing physicians to excessively refer patients to these clinics (rather than try exercise, diet improvement, cessation of smoking or medication). For the same reasons, it increases the risk of overutilization or inappropriate utilization of these services.

85.     Modern Vascular doctors use a Jetstream™ atherectomy system, manufactured by Boston Scientific, when performing atherectomies in their OBLs. These are single-use devices sold in large volumes by Boston Scientific to the MV Companies.

86.     Boston Scientific sales representatives (including Melissa Wasie), in support of their Jetstream systems, have personally visited OBLs owned by MV Companies to assist physicians using Jetstream. They have personally observed physicians in the MV Companies' OBLs utilizing Jetstream™ atherectomy systems in medically unnecessary procedures on patients with no arterial blockage and no need for an atherectomy. They have seen MV Company doctors perform dye tests on patients that demonstrated a free and unobstructed blood flow in a healthy normal artery, and been shocked to see the MV Company doctor schedule and perform medically unnecessary atherectomies on these patients. The Boston Scientific clinical specialists were shocked to see MV Company doctors schedule and perform atherectomies after a dye test confirmed no blockage and no

18

procedure required.

87.     The performance of unnecessary atherectomies by MV Company doctors was so widespread that Boston Scientific representatives confirmed this practice in internal memos submitted via Boston Scientific Peripheral Intervention internal complaint system, overseen by manager Josh Thomas, regional manager Steve Lundgren, and Vice President of Sales, David Van Horne. Boston Scientific supervisors and managers turned a blind eye to these complaints, not wanting to take any action that would reduce the number of Boston Scientific Jetstream products purchased by the OBLs owned by the MV Companies.

88.     Modern Vascular former Proceduralists (including David Wood in Arizona and Brian Zernich from the Mesa location) can confirm that Gampel relentlessly pressured them and all Modern Vascular Proceduralists, to perform invasive procedures on an unreasonably high percentage of referred patients. Wood and Zernich quit, in part because of this pressure to perform medically unnecessary procedures.

89.     These atherectomy procedures have some of the highest reimbursement rates by Medicare, which is why the MV Companies were incentivized to perform them regardless of whether they were medically necessary.

**I.     Harm to the Patients**

90.     Gampel's scheme raises patient safety and quality of care concerns because these invasive procedures have more potential complications than the conservative treatments. Potential complications including severe bleeding, infection, amputation and death.

91.     When plaque is shaved from an arterial wall during an atherectomy, sometimes the plaque migrates downstream causing an arterial occlusion. This can stop blood flow and result in the amputation of a foot or leg.

92.     Additionally, performing invasive procedures on healthy arteries that have no blockage and no need for an invasive procedure can result in complications, the risk of which is unwarranted due to the artery having no blockage that requires treatment.

93.     The Referring Investors get kickbacks for referring patients to these OBLs. The kickbacks take the form of dividends paid by the MV Companies to the Referring Investors who refer patients to the OBL owned by the MV Company in which they own shares. The Referring Investors additionally profit via the increase in the value of their investments.

94.     This profit motive causes the Referring Investors to place their profit motive above the interest of the patients.

95.     One Referring Investor, Lewis Freed, DPM (a podiatrist in Mesa, Arizona), noticed a problem with the patients he referred to the OBL in Mesa, Arizona (either on McKellips Road or S. Ellsworth Rd.) owned by the MV Company (either Modern Vascular of Mesa, LLC; or Modern Vascular Institute, LLC) in which he invested. He saw that these patients were getting poor care and, against his own financial interest, stopped referring patients to this OBL. When Freed stopped referring patients to the OBL, Gampel terminated Freed's interest in the MV Company that owned the OBL, forcibly buying back Freed's shares. Unfortunately, other physicians and podiatrists continued to refer patients to the OBL company in which they were invested, regardless of the quality of care, in order to maintain their investments.

96.     Doug Griffin, DPM (Freed's partner and also a presumed investor) was told by Yury that if Freed started referring patients again, he could regain his ownership shares.

97.     The kick-back arrangement, and pressure from Gampel to maximize profits, has caused doctors at Modern Vascular OBL's to perform unnecessary atherectomy procedures as confirmed by Boston Scientific representatives, and by Proceduralists formerly employed at Modern Vascular OBLs, as discussed above.

## V.    THE ANTI-KICKBACK STATUTE

98.     The Anti-Kickback Statute ("AKS") makes it a felony to knowingly pay or accept remuneration to induce anyone "to refer an individual to a person for the furnishing[,] or arranging for the furnishing[,] of any item or service for which payment

1   may be made in whole or in part under a Federal health care program." 42 U.S.C. §

2   1320a-7b(b)(2)(A). The AKS holds liable both the person paying and the person accepting

3   a kickback.

4        99.   Unlawful remuneration includes any payment or other benefit made directly

5   or indirectly, overtly or covertly, in cash or in kind, for referrals, subject to specific

6   exclusions. 42 U.S.C. § 1395nn(h)(1)(B), 42 C.F.R. § 411.351.

7        100.   Unlawful remuneration likewise includes that which is provided: "in return

8   for referring an individual to a person for the furnishing or arranging for the furnishing of

9   any item or service for which payment may be made in whole or in part under a Federal

10   health care program." 42 USCS § 1320a-7b(A).

11        101.   Compliance with the AKS is a condition of payment by Federal healthcare

12   programs, including Medicare, and a claim for reimbursement from such programs for

13   items or services furnished or arranged in return for a kickback is a false claim under the

14   FCA. *See* 42 U.S.C. § 1320(a)-7b(g), *United States v. Omnicare, Inc.*, No. 07-cv-05777,

15   2013 U.S. Dist. LEXIS 102543, *27 (N.D. Ill. July 23, 2013).

16        102.   A 2010 clarifying amendment of the AKS provides that "a claim [to a

17   Federal healthcare program] that includes items or services resulting from a violation of

18   [the AKS] constitutes a false or fraudulent claim for purposes of" the False Claims Act.

19   Patient Protection and Affordable Care Act, Pub. L. 111–148, § 6402, 124 Stat. 468, 759

20   (2010), *codified at* 42 U.S.C. § 1320a-7b(g).

21        103.   If even one purpose of remuneration is to induce referrals for covered items

22   or services, such payment of remuneration violates the AKS. In such circumstances,

23   claims for Federal reimbursement arising from the referrals violate the FCA, even if other,

24   legitimate purposes may be present.

25        104.   The statute has been interpreted to cover any arrangement where one

26   purpose of the remuneration was to obtain the referral of services or to induce further

27   referrals. *See, e.g., United States v. Nagelvoort*, 856 F.3d 1117 (7th Cir. 2017).

28        105.   A health care provider issued an NPI can file claims with Medicare to

provide reimbursement for services provided to beneficiaries. To do so, they must submit a CMS 1500 claim form or its electronic equivalent. That form contains information required to obtain reimbursement. Among other things, this includes the NPI, the beneficiary's name, health insurance claim number, dates of service, locations of service, type of services, number of services, the (HCPCS or CPT) procedure codes, diagnostic codes, charges, and the provider's Provider Transaction Access Number. A blank copy of a Form CMS 1500 is available at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf.

106.   The CMS 1500 claim form contains certifications that must be signed in order for the claim to be paid. Those certifications include, among other things, that: (1) the information provided is true, accurate, and complete, (2) the provider is familiar with, and the claim complies with, all applicable laws, regulations, and program instructions for payment, including but not limited to the Federal anti-kickback statute and the Stark Law, (3) the services were medically necessary, and (4) the services were furnished personally by the provider or an employee thereof.

107.   The MV Companies presented claims to CMS that were tainted by the kickback scheme because the patients were referred by the Referring Investors (investor/physicians who owned shares in the MV Companies that owned the OBLs.) The claims were also often for unnecessary procedures.

108.   Defendants satisfied the scienter requirement because they knew they were engaged in an illegal kickback scheme or, at a minimum, had at least some bad purpose to do something that the law forbids.

109.   Relators' allegations raise a plausible inference that Defendants knew that the arrangement—and thus Defendants' claims for patients referred via the Kickback arrangement—were unlawful.

110.   Even if they did not have this level of scienter, their conduct was knowing and willful. After the effective date of the Affordable Care Act, a person need not have actual knowledge of the AKS or have a specific intent to commit an AKS violation in

1    order to violate the AKS. Knowing and willful conduct is all that is necessary for an AKS

2    violation.

3        111.    Because Relators were not employed by Defendants, they would not be

4    expected to have access to information about Defendants' claims submissions. Where a

5    relator lacks access to all facts necessary to detail his claim, it is enough that his

6    allegations support an inference that Defendants necessarily submitted claims covering

7    items or services resulting from an AKS violation.

## VI.    RELIABLE INDICIA AND THE "WHO, WHAT, WHERE AND WHEN" OF THE FRAUD

### A.    Reliable Indicia

11       112.    Although Relators do not have knowledge of actual patient names for whom

12   false claims were submitted to Medicare or other government payors, Relators' allegations

13   have reliable indicia demonstrating a strong inference that false claims were submitted to

14   the Government.

15       113.    One key reliable indicium is that once physicians invested in a MV

16   Company, they abruptly changed their referral practice to stop referring patients to various

17   vascular specialists in the area, and to begin referring patients to the MV Company in

18   which they invested. These vascular specialists have records that will demonstrate which

19   physicians in the area suddenly stopped referring patients to them once those physicians

20   invested in a MV Company.

21       114.    Additionally, in the San Antonio Call and numerous other calls, Gampel has

22   solicited physicians and podiatrists to become investors promising them huge returns on

23   their investments, in the form of monthly dividend checks that approach the value of their

24   entire investment, and an eventual sale that would return as much as 80 times their initial

25   investment.

26       115.    The rapid growth, high salaries, and high volume of procedures per day are

27   made possible by the kickback scheme. In a legitimate endovascular practice that does not

28   rely on kickbacks, the number of procedures per day and salary is much lower, and the

practice grows much more slowly. A legitimate investment in an OBL that was not premised on a kickback scheme might yield a profitable return, but nowhere near 80 times the initial investment.

**B.   WHO**

116.   The primary participants in the kickback scheme were: (1) Gampel and Brannan (who created the scheme and established the MV Companies). Gampel and Brannan, the companies they established, and/or the physicians performing invasive procedures at the OBLs owned by those companies, submitted the claims (for invasive procedures) which were often medically unnecessary, tainted by the kickback payments, tainted by the referrals from the Referring Investors who invested in the MV Companies and referred patients to the OBLs owned by the MV Companies in which they invested, and received dividend payments from the MV Companies as kickbacks for referring patients to them.

117.   The MV Companies (controlled by Gampel with the assistance of Brannan) were participants in the scheme because they submitted the tainted claims to Medicare, Medicaid, TRICARE, the Indian Health Service, and other Government programs, and falsely certified that the claims submitted were not the result of payments that violated the Stark Law and the Anti Kickback Statute, and falsely certified that they were medically necessary.

**C.   WHAT AND HOW**

118.   The "what" and "how" is the kickback scheme described herein. The terms of the scheme are set forth in the Subscription Agreements and/or Operating Agreements signed by Gampel, the MV Companies and the Referring Investors. The kickbacks take the form of the dividends paid by the MV Companies to the Referring Investors who own shares in that MV Company and who refer patients to the OBL owned by that MV Company, and the increased value of their investments that are monetized when the MV Companies are sold.

1

**D.    WHERE**

2

119.    The kickback scheme originated and is managed from Gampel's office in

3

the Phoenix, Arizona area, and is carried out at each of the OBLs owned by the MV

4

Companies, listed in the "Locations and Physicians" section of this Complaint.

5

120.    All locations share the same website, www.modernvascular.com, and the

6

same phone number, 888-853-1278.

7

121.    Gampel is in the process of establishing additional OBL's throughout the

8

country, and soliciting podiatrists and physicians in the region to be Referring Investors.

9

**E.    WHEN**

10

122.    The kickback and referral schemes began in or around 2016, when Gampel,

11

with Brannan's assistance, began establishing the MV Companies to perpetrate their

12

scheme, and began to solicit referral physicians to invest in the MV Companies. The MV

13

Companies began operating their OBLs in or around 2016 or later. They began accepting

14

unlawful referrals and performing medically unnecessary procedures immediately upon

15

the opening of each OBL, and began paying kickbacks in the fourth month after the

16

opening of each OBL. These schemes continued to the present, with the MV Companies

17

(and the physicians therein) submitting the tainted and false claims.

18

**VII.    GAMPEL'S KICKBACK SCHEME DOES NOT FIT WITHIN A
         SAFE HARBOR TO THE ANTI-KICKBACK STATUTE**

19

20

123.    Several "safe harbor" exceptions to the Anti-Kickback Statute are listed in

21

42 CFR 1001.952. Defendants may claim that they fall within the "40% Interest" Safe

22

Harbor listed at 42 CFR 1001.952 (a)(2), which permits physicians to refer patients to

23

entities where the referring physicians own 40% or less of the entity. However, the (a)(2)

24

"40% Interest" Safe Harbor has eight standards, all of which must be met to fit within the

25

Safe Harbor. Failure to meet any one of the eight standards, makes the investment scheme

26

a violation of the Anti-Kickback Statute. Defendants fail three of the eight standards, as

27

described below.

28

### A. Standard (vi): Maximum 40% of Revenue from Referring Investors

124. Defendants fail to meet the sixth standard, which requires: "No more than 40 percent of the entity's gross revenue . . . may come from referrals . . . from investors." 42 CFR 1001.952(a)(vi).

125. The MV Companies established pursuant to Gampel's scheme clearly violate this standard because they get more than 40% of their revenue from investor referrals. In fact, the OBLs get almost 100% of their revenue from investor referrals because of the way that they are set up.

126. As stated above, Gampel's business model is to establish multiple MV Companies, one for each OBL. Gampel sells 40% of each MV Company (the maximum allowed by the (a)(2) 40% Interest Safe Harbor to physicians in the area who refer patients to the OBL.

127. Close to 100% of the patients referred to the OBLs set up by Gampel are referred by investors in the MV Company that owns the OBL.

### B. Standard (ii): Offer Same Terms to Referring and Non-Referring Investors

128. Defendants also fail to meet the second standard, which requires: "The terms on which an investment interest is offered to a passive investor, if any, who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must be no different from the terms offered to other passive investors." 42 CFR 1001.952(a)(ii).

129. Under Gampel's scheme, investment interests are not offered to investors who are not in a position to make referrals.

### C. Standard (iv): Investors Must Refer Patients

130. Defendants also fail to meet the fourth standard, which requires: "There is no requirement that a passive investor, if any, make referrals to, be in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for

26

1   the entity as a condition for remaining as an investor."

2   131.   Defendants violate this standard. In fact, during the San Antonio Call,

3   Gampel stated that any investor who became in a position where he was unable to

4   continue referring patients (for example, by moving out of the area) would be forced to

5   sell his shares.

6   132.   As stated above, one Referring Investor, Lewis Freed, DPM (a podiatrist in

7   Mesa, Arizona), noticed a problem with the patients he referred to the OBL in Mesa,

8   Arizona (either on McKellips Road or S. Ellsworth Rd.) owned by the MV Company

9   (either Modern Vascular of Mesa, LLC; or Modern Vascular Institute, LLC) in which he

10  invested. He saw that these patients were getting poor care and, against his own financial

11  interest, stopped referring patients to this OBL. When Freed stopped referring patients to

12  the OBL, Gampel terminated Freed's interest in the MV Company that owned the OBL,

13  forcibly buying back Freed's shares.

14  133.   The forced buyback of Freed's shares demonstrates the violation of this

15  fourth standard because when Freed violated the requirement that he make referrals to the

16  company, he was not permitted to remain an investor.

17  134.   Doug Griffin, DPM (Freed's partner and also a presumed investor) was told

18  by Yury that if Freed started referring patients again, he could regain his ownership

19  shares.

20  **VIII.   STARK LAW VIOLATIONS**

21  135.   The Stark Law prohibits physicians and certain other entities providing

22  healthcare items and services from submitting Medicare claims for payment for items and

23  services that are the product of patient referrals from physicians having an impermissible

24  "financial relationship" (as defined in the statute) with the physicians. *See* 42 U.S.C. §

25  1395nn.

26  136.   The Stark Law requires that the Medicare program deny payment for claims

27  for any services billed in violation of its provisions. 42 U.S. C. § 1395nn(g). In addition, it

28  requires that providers who have collected Medicare payments for a healthcare service

"performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353. The Stark Law is also applicable to Medicaid claims. 42 U.S.C. §1396b(s).

137.   The Stark Law establishes the presumptive rule that providers may not bill, and the Medicare program will not pay for, designated health services (as defined in the statute) generated by a referral from a physician with whom the provider has a financial relationship. 42 U.S.C. §§ 1395nn(a)(1), and (g)(1).

138.   Congress enacted the Stark Law in 1989 because it found that financial relationships between physicians and entities to whom they refer patients can compromise the physicians' professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality.

139.   Congress relied upon various academic studies consistently showing that physicians who had financial relationships with entities to which they referred used more of those entities' services than similarly situated physicians who did not have such relationships. The Stark Law was designed to protect the taxpayer from paying for the costs of questionable utilization of services by removing monetary influences on referral decisions.

140.   At all times relevant to this Complaint, the Stark Law has applied to payments to referring physicians by physicians and the resulting claims to the Medicare program.

141.   The Stark Law provides:

(a)   Prohibition of certain referrals

(1)   In general. Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then—

(A)   the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B)    the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

142.    Because compliance with the Stark Act is a condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes were material and form the basis of liability under the False Claims Act.

143.    Had the United States known that Defendants were obtaining Medicare and/or Medicaid eligible referrals from physicians with whom Defendants had an unlawful financial relationship, the United States would not have funded reimbursements for these referred patients.

144.    The financial relationship between the physician/investors (the Referring Investors) and the MV Companies caused the multitude of referrals between the parties to be strictly illegal and had the direct effect of significantly increasing the amount of patients for which Defendants received Medicare reimbursements, and in patients receiving excessive and unnecessary invasive procedures, motivated by the referring physicians' interest in maximizing the revenue of the MV Companies in which they had an ownership interest.

145.    Each time a MV Company (or any Defendant) made a clam to the Government for charges associated with an invasive procedure, for a patient referred by an Investor Defendant with an ownership interest in that MV Company, the claim and any documents related to that claim constituted a violation of the Stark Law.

146.    Accordingly, Defendants' unlawful relationship with the Referring Investors) had the indirect effect of increasing the amount of money spent by the federal government for payments and reimbursements covered by Medicaid, Medicare, the Indian Health Service, and the TRICARE health care systems. This illegal relationship and the cost to the federal government represent a violation of the Stark Law, in violation of 42 U.S.C §1395nn.

## IX.   THE FALSE CLAIMS ACT

147.   The False Claims Act provides, *inter alia*, that any person who—

(A)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)   conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . . or

(G)   knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729 (a)(1)(A-G).

148.   The term "claim" includes "any request or demand, whether under a contract or otherwise, for money . . . that—

(i)   is presented to an officer, employee, or agent of the United States; or

(ii)   is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)   provides or has provided any portion of the money or property requested or demanded; or

(II)   will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

31 U.S.C.A. § 3729 (a)(2).

30

149.    Any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable to the Government for a civil penalty for each claim between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017, plus three times the actual damages that the Government sustained. 31 U.S.C. § 3729(a).    The Act permits assessment of the civil penalty even without proof of specific damages.

150.    The FCA defines a "claim" for payment to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). Accordingly, pursuant to the express language of the FCA and the statutory definition of "claim," Medicaid claims submitted to state Medicaid agencies are considered to be claims presented to the federal government (just as are claims submitted to Medicare and other federal programs) and thus may give rise to liability under the FCA.

## X.    DEFENDANTS' VIOLATIONS OF THE FCA

151.    Defendants routinely and systematically violated the FCA by wrongfully obtaining and retaining substantial funds from Government healthcare programs—including but not limited to Medicare, Medicaid, the Indian Health Service, Tricare/CHAMPUS, and the Veterans Administration ("VA")—through false claims and false statements made in connection with medical services provided by the MV Companies through the illegal referral scheme, since at least 2016.

152.    Violations of the Anti-Kickback and Stark statutes can be pursued under the False Claims Act, since they would influence the government's decision of whether to reimburse Medicare Claims." *United States ex rel. Reidel v. Bos. Heart Diagnostics Corp.*, 2018 U.S. Dist. LEXIS 155113, *7-8, __ F.Supp.3d __, 2018 WL 4354944

(D.D.C. Sept. 12, 2018) (citing *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 565 F. Supp. 2d 153, 159 (D.D.C. 2008).

153.    A claim that includes items or services resulting from a violation of the Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

## XI.    CAUSES OF ACTION

### A.    COUNT ONE - STARK LAW VIOLATIONS CONSTITUTING FALSE CLAIMS ACT VIOLATIONS

154.    All paragraphs of this Complaint are incorporated herein by reference.

155.    As alleged above, the MV Companies submitted Medicare, Medicaid, the Indian Health Service, and TRICARE claims for payment for items and services (invasive procedures) that are the product of patient referrals from the Referring Investors, which have an impermissible "financial relationship" (as defined in the statute) with the MV Companies. *See* 42 U.S.C. § 1395nn.

156.    The Stark Law requires that the Medicare program deny payment for these claims because they were billed in violation of its provisions. 42 U.S.C. § 1395nn(g).

157.    The Stark law also requires that Defendants who have collected Medicare payments for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353. The Stark Law is also applicable to Medicaid claims. 42 U.S.C. §1396b(s).

158.    Accordingly, the United States is entitled to refund of all amounts paid to each MV Companies for performance of invasive procedures on patients referred by any physician/investor in that MV Company.

### B.    COUNT TWO – ANTI-KICKBACK STATUTE VIOLATIONS CONSTITUTING FALSE CLAIMS ACT VIOLATIONS

159.    All paragraphs of this Complaint are incorporated herein by reference.

160.    As alleged above, the MV Companies submitted Medicare, Medicaid, Indian Health Service, and TRICARE claims for payment for items and services that are

tainted by a kickback scheme in violation of the Anti-Kickback Statute.

161.   Defendants knowingly or with deliberate ignorance or reckless disregard for the truth, presented, or caused to be presented, to an officer, employee, or agent of the United States, or a contractor thereof, false or fraudulent claims that were paid with federal funds. Those claims were false or fraudulent because they were for services that were provided in violation of the Federal anti-kickback statute.

162.   Each of the MV Companies knowingly and willfully offered and paid remuneration (in the form of dividends to the physicians who owned shares in that MV Company) to induce those physicians to refer patients to that MV Company, for which payment was made in whole or in part by the Medicare program, Indian Health Service, and/or TRICARE or other government programs.

163.   The MV Companies knowingly presented, and/or caused to be presented, false claims for payment or approval to the United States, when they submitted and/or caused the submission of claims to Medicare and/or TRICARE or other government programs for treatment of PAD (including angiograms, balloon angioplasty and atherectomy procedures). These submissions were impermissibly linked to kickbacks in violation of the Anti-Kickback Statute.

164.   Accordingly, the United States is entitled to refund of all amounts paid to each MV Company for treatment of patients referred by any physician who had an investment in that MV Company.

165.   Pursuant to the Anti-Kickback Statute and the False Claims Act, the defendants are liable to the United States under the treble-damage and civil-penalty provisions of the False Claims Act for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, and for violations of the FCA after November 2, 2015, a civil penalty of not less than $10,781 and not more than $21,563, plus three times the amount of damages that the United States has sustained because of the Defendants' actions.

**C.    COUNT THREE – BILLING FOR MEDICALLY UNNECESSARY ATHERECTOMIES CONSTITUTING FALSE CLAIMS ACT VIOLATIONS**

166.    All paragraphs of this Complaint are incorporated herein by reference.

167.    As alleged above, the MV Companies submitted Medicare, Medicaid, the Indian Health Service, and TRICARE claims for payment for unnecessary atherectomies.

168.    The most basic requirement for reimbursement eligibility under Medicare is that the service provided must be reasonable and medically necessary. See, e.g., 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, et seq.; 42 C.F.R. § 410.50. Medical providers are not permitted to bill the government for medically unnecessary services or procedures performed solely for the profit of the provider. *See id.*

169.    Medicare requires every provider who seeks payment from the program to certify and ensure compliance with the provisions of the Anti-Kickback Statute, and with other federal laws governing the provision of health care services in the United States. That agreement represents an ongoing obligation, and the provider must notify the government of any change in information or certifications provided.

170.    CMS will not pay a claim if a provider tells CMS or its agent that it provided goods or services: in violation of the Anti-Kickback Statute; that were medically unnecessary; that were performed solely for the profit of the provider; and/or, that violated another relevant law.

171.    As alleged above, the doctors at the MV Companies performed medically unnecessary atherectomies, as witnessed by representatives of Boston Scientific, and billed the Government for these procedures.

**D.    LIABILITY OF GAMPEL AND BRANNAN, THE MV COMPANIES, AND THE REFERRING INVESTORS**

172.    All paragraphs of this Complaint are incorporated herein by reference.

173.    In addition to the liability of the MV Companies, who actually submitted the claims for payment that were tainted by the Stark Law and Anti-Kickback violations, and were for unnecessary procedures, Gampel and Brannan are liable for the False Claims Act

1  violations because, although they may not have directly submitted the claims at issue, they

2  caused those claims (and/or records and statements material to those claims) to be

3  submitted by setting up the network of MV Companies and concocting the scheme alleged

4  herein.

5      174.   Similarly, the Referring Investors (the physicians who invested in a MV

6  Company, referred patients to a MV Company, and received dividend payments from that

7  MV Company) are liable because they caused those claims (and/or records and statements

8  material to those claims) to be submitted by investing in a MV Company and referring

9  patients to that MV Company in exchange for dividend payments.

10      175.   The FCA not only imposes liability on those who submit false claims and

11  records; it imposes liability on those who *cause* a false claim to be submitted, and those

12  who *cause* a false record or statement to be made or used which is material to a false

13  claim. 31 U.S.C.A. § 3729 (a)(1)(A and B).

14      176.   Additionally, §3729 (a)(1)(C) of the FCA imposes liability on those who

15  conspire to commit a violation of §3729 (a)(1)(A and B). All Defendants are liable for

16  conspiring to violate the Anti-Kickback Statute and the Stark Law, thus violating the False

17  Claims Act.

18      177.   For each MV Company, Gampel and Brannan and the Referring Investors

19  who invested in that MV Company entered into an illegal agreement (the Subscription

20  Agreement and/or Operating Agreement that set forth the terms of the investment) that

21  violated the Stark Law and the Anti Kickback Statute.

22      178.   Gampel and Brannan took overt steps in performing his role in the

23  conspiracy by forming the MV Companies, soliciting investors in each MV Company,

24  drafting the illegal Subscription Agreement and/or Operating Agreement, hiring the

25  physicians to perform invasive procedures at the OBLs owned by the MV Companies, and

26  submitting claims to Medicare, Medicaid, the Indian Health Service, TRICARE and other

27  government programs that were tainted by the unlawful referral and kickback scheme, and

28  were for unnecessary procedures.

179.   Each Investor Defendant conspired with Gampel and Brannan and the MV Company in which he or she invested (and took overt steps in performing their roles in the conspiracy) by signing the illegal kickback agreement, referring patients to the OBL owned by that MV Company, and accepting payments from that MV Company.

180.   All participants in the conspiracy (Gampel and Brannan, the MV Companies, and the Referring Investors) intended to defraud the government by participating in this conspiracy to submit claims to Medicare, Medicaid, the Indian Health Service, TRICARE and other government programs that were false because they violated the Stark Law and Anti Kickback Statute.

181.   Accordingly, Gampel and Brannan, Gampel and Brannan's Companies, the MV Companies and the Referring Investors are liable for causing the false claims and records to be made and for conspiring with each other to carry out Gampel and Brannan's unlawful referral and kickback scheme, as described herein.

## **PRAYER**

WHEREFORE, Relators pray for the following relief for their FCA claims:

1.   A permanent injunction requiring Defendants to cease and desist from violating the Stark law and Anti-Kickback Statute;

2.   Judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of the Defendants' unlawful conduct;

3.   Civil monetary penalties for each false and fraudulent claim submitted to the United States by Defendants, as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

1      4.      An award to Relators pursuant to 31 U.S.C. §3730(d) of reasonable

2  attorneys' fees, costs, and expenses;

3      5.      Such other relief as the Court deems just and equitable.

4  **XII.   JURY DEMAND**

5      Relators hereby demand a trial by jury.

7      Respectfully submitted this 22nd day of January 2020.

8                                      ROBAINA & KRESIN PLLC

10                                     By
11                                         Edmundo P. Robaina

13                                     Cory S. Fein (TX State Bar No. 06879450)
                                       (pro hac vice pending)
14                                     CORY FEIN LAW FIRM
15                                     712 Main Street, Suite 800
                                       Houston, TX 77002
16                                     (281) 254-7717
                                       (530) 748-0601 (fax)
17                                     cory@coryfeinlaw.com

19                                     Attorneys for Relators, Jay Radhakrishnan and
                                       William Julien