WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States *ex rel*. Radhakrishnan, *et al*.,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>Yury Gampel, *et al*.,<br><br>　　　　　Defendants. | No. CV-20-00176-PHX-GMS<br>**LEAD CASE**<br><br>Consolidated with:<br>No. CV-21-00010-PHX-SPL<br>No. CV-21-01206-PHX-GMS<br><br>**ORDER** |
| United States *ex rel*. Terry, *et al*.,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>Modern Vascular of Glendale LLC, *et al*.,<br><br>　　　　　Defendants. | |
| United States *ex rel*. Katherine Diggins, *et al*.,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>Modern Vascular LLC, *et al*.,<br><br>　　　　　Defendants. | |

Pending before the Court are: (1) Defendant Yury Gampel's Motion to Dismiss (Doc. 85); (2) The Modern Vascular Defendants'[1] Motion to Dismiss (Doc. 86); and, (3), the Defendants' Joint Motion for Leave to Conduct Limited Discovery in Advance of Rule 26(f) Conference (Doc. 97). For the reasons stated below, the Motions are denied.[2]

## BACKGROUND

The United States brings actions for False Claims Act violations against Yury Gampel and a number of Modern Vascular entities in which it alleges Gampel has a controlling interest. (Doc. 30 at ¶¶ 24, 106). These Modern Vascular office-based lab ("OBL") franchises provide medical evaluation and treatment of peripheral arterial disease ("PAD") through vascular intervention procedures. Gampel and two Modern Vascular entities--Modern Vascular LLC and Modern Vascular of South Florida LLC — in each of which Gampel holds controlling interests--also have the controlling interests in each of the separate Modern Vascular OBL franchises. Four management entities — three different Modern Vascular Management entities and Nobility Management LL — all again controlled by Gampel — manage and provide IT services for each of the OLB franchises. The Government's Complaint collectively refers to the two ownership and four management entities as "Modern Vascular Corporate."

In essence, the Government's Complaint alleges that Gampel and Modern Vascular Corporate operate a financial fraud scheme in and through their OBL franchises. (*Id.* at ¶¶ 4, 105). The Government alleges that to build the customer base for each franchise and

---

[1] The Modern Vascular Defendants include: Nobility Management, LLC; Modern Vascular, LLC; Modern Vascular of South Florida, LLC; Modern Vascular Management, LLC; Modern Vascular Management-West, LLC; Modern Vascular Management—East, LLC; Modern Vascular Institute, LLC: Modern Vascular of Mesa, LLC; Modern Vascular of Glendale, LLC; Modern Vascular of Sun City, LLC; Modern Vascular of Tucson, LLC: San Antonio Vascular Specialists Corp; Fort Worth Vascular Specialists Corp.; Modern Vascular of Denver, LLC; Modern Vascular-Navajo, LLC; Modern Vascular of Fairfax, LLC; Modern Vascular of Houston, LLC; Modern Vascular of Indianapolis, LLC; Modern Vascular of Southaven, LLC; Modern Vascular of St. Louis, LLC; and Modern Vascular of Kansas, LLC.

[2] To the extent it is not mooted by the denial of the Motions to Dismiss the Defendants' Motion for Early Discovery (Doc. 97) is also denied in absence of a clear definition of the type of discovery sought and good cause for seeking it in the minimal period between the denial of this motion and the parties' imminent compliance with Fed. R. Civ. P. 26(d)(1).

enhance the franchise's revenue the Defendants offered financial rewards to physicians who had good referral relationships with vascular surgeons or other medical professionals who used OBL franchises. (*Id.* at ¶ 111). These financial rewards included a low-cost equity interest of up to two percent in an OBL franchise. (*Id.* at ¶¶ 111-12, 142-44, 162). The Government alleges that Defendants tracked the number of referrals they received through the physician investors, (*Id.* at ¶¶116-120), and, at least in some cases, determined the percentage of equity ownership--up to two percent--for which a referring physician would qualify based on the physician's referral levels. (*Id.* at ¶¶ 5, 108, 121-30). In any event, equity ownership was only offered to those who had relationships that could produce referrals. Based on a specific instance, the United States further alleges that equity ownerships were "bought out" from the equity owner if the level of physician referrals did not remain at an acceptable level to sustain the equity ownership (*Id*. ¶¶ 5, 114-15). The continued equity ownership resulted in periodic dividends paid out to the owners which varied at the percentage of the equity ownership and/or promises of gain upon sale of the franchises. (*Id.* at ¶¶ 138-40). The Complaint also alleges that when the patients were treated at the OBL, the OBLs aggressively pursued and pressured their physician employees to perform invasive procedures, e.g., angioplasty and atherectomy "which reimburse at a higher rate." (*Id.* at ¶¶ 2, 6, 134-37, 154-162.)

This, the Complaint alleges, violates the federal Anti-Kickback Statute (AKS) and resulted in tens of millions of dollars for reimbursement on fraudulent claims submitted to Medicare and Tricare programs (*Id*. at ¶7) and violates the Federal False Claims Act. Thus, the Government's Complaint, in addition to asserting two separate counts for False Claims Act violations (Counts I and II), asserts a count for unjust enrichment (Count III) and a count for payment by mistake (Count IV).

## ANALYSIS

The Defendants bring Motions to Dismiss all of Plaintiff's claims under Fed. R. Civ. P. 12(b)(6) and 9 (b). "A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. … A complaint may be dismissed as a matter of law either for lack of a

cognizable legal theory or for insufficient facts under a cognizable legal theory … In ruling on the motion, a court must accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *United States ex rel. Everest Principals, LLC v. Abbott Labs Inc.,* 2022 WL 3567063 at *4 (S.D. Cal. Aug. 18, 2022) (citations omitted).

### 1. The False Claims Act Counts

Pursuant to the Government's Complaint the Defendants violated the False Claims Act by violating the AKS. "[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. § 1320a-7b(g). To allege a violation of the AKS the Government must allege facts sufficient to make it plausible that "the defendant (1) 'knowingly and willfully' (2) offered or paid remuneration, (3) 'to induce' the purchase or ordering of products or items for which payment may be made under a Federal healthcare program." *Everest Principals,* 2022 WL 3567063 at *5. There must also be a sufficient "connection between the alleged kickback scheme and actual false claims submitted to the government." *Id.*

#### a. Knowing and Willful

Here the United States has sufficiently alleged that the Defendants were knowingly and/or willingly reimbursing their physician-investors based on the number of referrals to the OBLs credited to those investors. This is sufficient to state a claim or claims for violating the False Claims Act. These allegations differ from the hypothetical business relationship discussed in *Hanlester Network v. Shalala,* 51 F.3d 1390, 1399 (9th Cir. 1995) in which equity ownerships were openly available to purchase and dividend payments were made based purely on percentage of ownership and were not related to credits for referrals. In such a case, "the opportunity to profit indirectly from referrals when they [physician-investors] could not profit directly" would amount to nothing more than business encouragement which is not a violation of the AKS. *Id.* at 1398.

Here, however the Complaint's allegations like those actually demonstrated in *Hanlester*, were that "eligibility to purchase shares depended on an agreement to refer

program-related business, … the number of shares they would be permitted to purchase … would depend on the volume of business that they referred to the labs … [and] that partners who did not refer business would be pressured to leave the partnerships." *Id*. *Hanlester Network v. Shalala,* 51 F.3d 1390, 1400 (9th Cir. 1995) (holding that one must "knowingly and willfully … offer[] or pay[] remunerations in exchange for referrals, rather than knowingly and willfully violating the AKS.")

Further, unlike the facts in *United States ex rel. Fitzer v. Allergan, Inc.,* 2021 WL 4133713 at *7 (D. Md. Sept. 10, 2021), the United States has pleaded that Mr. Gampel was "familiar with the relevant AKS requirements to establish a violation of the AKS," (Doc. 30 at ¶¶ 142-46), and that he engaged in specific acts to conceal those violations. That the Defendants might use some or all of Mr. Gampel's awareness of the AKS, or other facts, in arguing that such facts equally support an exonerating conclusion is not a basis on which to conclude that the Defendant has not sufficiently alleged the "knowing and willing" element. The United States's assertions, if cumulatively accepted as true, as they must be at the motion to dismiss stage, are a sufficient basis on which a reasonable jury could find that the Defendants acted knowingly, willfully and unlawfully in offering or paying remunerations in exchange for referrals.

### b. Causation

In this case, the "investing physicians" who the Complaint alleges were getting the low-price equity memberships (including distributions) in exchange for referrals, were not the providers submitting the claims to Medicare and TRICARE. Defendants assert that, presumably, in such cases the treating physicians used their independent medical judgment as to their patient's need for services in the OBL even if the referral was made by investing physician colleagues. The presence in the equation of the treating physician, Defendants argue, breaks any causal chain required to establish a violation of the AKS and the False Claims Act when the investing physicians were the ones getting paid.

Yet, assuming that, in such cases, the treating physicians used their best judgment in making treatment decisions, and were getting paid nothing for their exercise of that

judgment, the Complaint nevertheless alleges that the investing physicians were getting paid for successful referrals to the OBLs. That is all that is necessary here in alleging causation regardless of which standard for causation applies in this circuit.

Contrary to the assertion of the Defendants, the AKS does not require that any alleged "kickbacks actually corrupted clinical decision-making …." *U.S. v. Regeneron Pharms., Inc.,* No. CV20-11217-FCS, 2020 WL 7130004, at *11, (D. Mass. Dec. 4, 2020). *U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp.3d 242, 263 (S.D.N.Y. 2014) (holding that "it is the kickback arrangement itself that constitutes the AKS violation, not the success of the arrangement."). Cases in this District and Circuit further demonstrate that in similar programs involving payments for referrals the necessary causation exists. *Kuzma v. Northern Arizona Healthcare Corporation,* 607 F. Supp.3d. 942, 951. (D. Ariz. 2022) citing 42 U.S.C. §1320a-7b (b)(2)(B). *U.S. v. Ctr. For Diagnostic Imaging, Inc.,* 787 F. Supp.2d 1213, 1221 (W.D. Wash. 2011) (holding that the United States had sufficiently stated a claim for False Claims Act violations against a diagnostic center defendant where the center "knew that paying physician groups to refer their government insured payments was unlawful … [and] continued to push for and use their illegal arrangements, even though the Office of the Inspector General ("OIG") issued a Special Advisory Bulletin, a Special Fraud Alert, and an Advisory Opinion warning about the potential illegality of similar joint venture agreements."). The Complaint clearly alleges that the referrals are credited to the investing physicians and tracked for them and that the investing physicians were being pressured thought the operations of the OBL franchises to generate referrals for them which resulted in equity ownership or higher percentages of equity ownership and dividends for the investing physicians.

The AKS criminalizes such conduct by Modern Vascular Corporate and the OBLs so long as it can be determined that Defendants "knowingly and willfully offer[ed to] pay [their investing members] to induce [them] to … arrange for [any] service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B). The conduct alleged to be engaged in by the investing

physicians and the Defendants plausibly qualifies as "arranging" for the service provided by the OBLs. At least at a motion to dismiss stage, it sufficiently alleges more than a mere temporal relationship between the alleged kickback scheme and the submission of allegedly tainted claims sufficient to state a claim. It also plausibly alleges that investing physicians were given financial benefits for patients who were "recommended or referred" to the OBLs while the referring physicians were also investing physicians. *United States ex. Rel. Greenfield v. Medco Health Sols., Inc.,* 880 F.3d 89, 99 (3d Cir. 2018). Specific instances of this, in any event, are actually pleaded in the Complaint. (Doc. 30 at ¶¶ 147-48).

This standard for causation has been used in the courts of this Circuit in the past. But, even assuming that the appropriate law in this Circuit requires the United States to establish that particular claims would not have been submitted absent the remuneration paid the investing physicians, *see, e.g., United States ex rel. Martin v. Hathaway,* No. 22-1463, 2023 WL 3806274 at *1 (6th Cir. May 16, 2023)*, United States ex rel. Cairns, v. D.S. Medical* LLC, 42 F4th 828, 836-37 (8th Cir. 2022), which the court is willing to consider at the appropriate time, the allegations of the Complaint are sufficient to plausibly infer such but-for causation. The Complaint alleges that the equity ownership, and percentage of equity ownership, allocated to investing physicians was made on the basis of actual referrals achieved through pre-existing and/or maintained relationships with other health care providers, including vascular surgeons, who would use the OBLs. Further, the Complaint alleges that the physician investors could lose their equity ownership if they did not maintain an appropriate level of referrals, and of course different levels of ownership resulted in different levels of dividend distribution. Finally, the Complaint specifically identifies claims that resulted from such referrals. It is not a stretch beyond plausibility to infer that referrals made under such financial arrangements would not have been made but for them. Thus, whether the court uses the "but-for" standard, or the "temporal relation plus" standard employed in the past in this and other circuits, causation is plausibly alleged.

### c. 9(b) Pleading with Particularity

The Complaint names 22 defendants without alleging facts pertaining to each particular Defendant. Nevertheless, the Complaint does allege the existence of a common scheme, in which separate defendants play distinct roles. For example, it alleges that either Gampel, or two of the Defendant Modern Vascular entities in which he has a controlling interest, themselves have a controlling interest in each of the remaining entity defendants. It alleges that the four management entities manage the business of each of the remaining OBL Defendants. It further alleges that each of the remaining OBL Defendants operate a common scheme with some modest exceptions for Modern Vascular of Fairfax, LLC, which allegedly operates slightly differently as a result of Virginia state law and for which separate factual allegations are made. The allegations of common control, common management and common scheme, together with the allegations of specific facts as it pertains to the operations in which all allegedly engage, are sufficient to state plausible claims against all Defendants, even if the allegations fall short at this point of probability as to all Defendants. "[I]n accord with general pleading requirements under Rule 9(b), []it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Everest Principals,* 622 F. Supp.3d at 931 quoting *Ebeid ex rel. U.S. v. Lungwitz,* 616 F.3d 993, 998-99 (9th Cir. 2010). *United States v. United Healthcare Insurance Company,* 848 F.3d 1161, 1180 (9th Cir. 2016) (holding that "[t]he complaint also need not "identify representative examples of false claims to support every allegation. … It is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'") (citations omitted). The factual defenses which the Defendants allege, *e.g.*, that certain OBLs did not have physician investors, that others never made any distributions, or that still others never made claims to CMS or TRICARE, are precisely that – factual objections. They may or may not preclude liability under the concerted scheme alleged. But, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." The United States has done so here. The refutation of such facts must await summary judgment.

### 2. The Common Law Claims

Both a payment by mistake and an unjust enrichment claim are available to the United States and are not necessarily derivative of False Claims Act claims. *United States v. Mead,* 426 F.2d 118, 124 (9th Cir. 1970) (holding that "[t]he government's alternative theory of recovery [to False Claims Act claims] is under the common law doctrine of payment by mistake. This remedy is available to the United States and is independent of statute.") Thus, the Government could bring a payment by mistake and/or an unjust enrichment claim against Defendants totally separate of the False Claims Act claims because "no statute is to be construed as altering the common law further than its words import." *Id.*

Defendants offer no authority for the proposition that Congress intended to eliminate common law claims, be they based under state or under federal common law, by passing the False Claims Act. Nor do they offer any Ninth Circuit authority that suggests that the amendment to the False Claims Act after *Mead* to lessen the *mens rea* requirement resulted in making the common law merely derivative of the Act. *United States v. Prabhu*, 442 F. Supp.2d 1008, 1035-36 (D. Nev. 2006) cannot appropriately be read differently. On summary judgment in *Prabhu* the Court determined that "[h]aving already determined that Dr. Prabhu's Medicare claims were justified under the False Claims Act, the Court cannot find as a matter of law that the retention of benefits arising therefrom is inequitable." *Id.* Of course, to the extent that the Court made the factual determination that payments to Prabhu were equitable as a general matter, one of the foundational elements of an unjust enrichment claim cannot be made. That does not mean, however, that such would be the result under all False Claims Act cases. Thus, to the extent that the court went on to unfortunately conclude that "[b]ecause Dr. Prabhu is entitled to summary judgment with respect to the False Claims Act, his retention of any benefit cannot constitute unjust enrichment as a matter of law," *Id.* It is, at best, overstatement and dicta. Such an

expansive conclusion is not always justified as the facts of *Mead* demonstrate. *Mead,* 426 F.2d at 118 (upholding the district court's judgment in favor of Defendants on the False Claims Act claims and reversing the District Court's judgment in favor of Defendants on the common law claims.) To the extent that the Defendants further cite *Aegis Therapies, Inc.,* 2015 WL 1541491 at *14 (S.D. GA. Mar. 31, 2015), for the proposition that unjust enrichment claims are derivative of False Claims Act claims, that Court, which is not bound by the Ninth Circuit's analysis or precedent, merely states a conclusion which it does not support by any precedent or analysis. It is inconsistent with the better and binding analysis of *Mead,* and is therefore not considered by this Court.

To the extent that Mr. Gampel was not the payee of any of the payments by the United States, that also does not prevent a claim of payment by mistake from being brought against him under the alleged circumstances. The Complaint alleges that Mr. Gampel has control of all of the entities that are Defendants in this claim. (Doc. 30 at ¶¶ 3, 24). It further alleges that each OBL was required to pay a combined thirteen percent of its revenues to the management entities controlled by Mr. Gampel. *Id.* at ¶¶ 25, 28-30. Under such allegations it is plausible that he was the beneficiary of such payments. In such circumstances a claim for payment by mistake seeking recovery can be brought against Mr. Gampel. *Mead*, at 124-25.

For the above reasons,

**IT IS THEREFORE ORDERED** denying (1) Defendant Yury Gampel's Motion to Dismiss (Doc. 85); (2) The Modern Vascular Defendants' Motion to Dismiss (Doc. 86); and, (3) the Defendants' Joint Motion for Leave to Conduct Limited Discovery in Advance of Rule 26(f) Conference (Doc. 97).

Dated this 1st day of March, 2024.

_____
G. Murray Snow
Chief United States District Judge